UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Lesa M. H.,[1] | |
| Plaintiff, | |
| -against- | 25-CV-2033 (ER) (RFT) |
| | **REPORT AND RECOMMENDATION** |
| FRANK J. BISIGNANO, COMMISSIONER OF SOCIAL SECURITY,[2] | |
| Defendant. | |

**TO THE HONORABLE EDGARDO RAMOS, UNITED STATES DISTRICT JUDGE:**

Plaintiff Lesa M. H. seeks judicial review of a final determination by Defendant Frank J. Bisignano, Commissioner (the "Commissioner") of the Social Security Administration (the "SSA"), denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). (*See* ECF 1, Compl. ¶ 1.) Plaintiff has filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, seeking reversal of the Commissioner's decision and remand for further administrative proceedings. (*See id*. at 8.)[3] Having carefully reviewed the administrative record (the "Record") and the parties' submissions,

---

[1]    To protect Plaintiff's privacy, she is identified by her first name and middle and last initials.

[2]    Frank J. Bisignano is the Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he is substituted as the defendant in this action.

[3]    The paragraph in which Plaintiff sets forth her request for relief is unnumbered, but it appears on page 8 of the Complaint. (*See* ECF 1, Complaint at 8.)

and for the reasons set forth below, I respectfully recommend that Plaintiff's motion be

GRANTED and that the case be remanded for further administrative proceedings.[4]

**BACKGROUND**

## I.      Procedural History

The Record is inconsistent about Plaintiff's date of filing her SSI claim: some documents

suggest a filing date of December 3, 2018 (*see* ECF 16, R. Pt. I at 23, 30, 34, 76, 84), while the

application summary indicates that Plaintiff filed her claim on January 7, 2019. (*See id.* at 76,

128, 169, 241, 266.)[5] Regardless, Plaintiff alleged disability beginning on June 1, 2015. (*See id.*

at 22, 76, 143, 154, 184, 254.) Her claim was initially denied on June 13, 2019, and again upon

reconsideration on September 9, 2019. (*See id.* at 76.)

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held

on June 17, 2020 by ALJ Angela Banks via telephone due to the pandemic. (*See id.*) Plaintiff and

vocational expert ("VE") Kenswa Harry both testified at the hearing, and consulting medical

experts Drs. David Guttman and R. Abueg provided evaluative reports. (*See id.* at 82-83, 189-

206.) The ALJ issued a decision on August 25, 2020, finding that Plaintiff is not disabled and

denying her claim for SSI. (*See id.* at 73-84.)

Plaintiff asked for a review of the decision on October 1, 2020. (*See id.* at 208.) On

January 20, 2022, the Appeals Council vacated the hearing decision and remanded the case to

---

[4]     Unless indicated otherwise, this report and recommendation omits internal quotation marks, citations, and alterations to quoted text.

[5]     Citations to "R" are to the administrative record, and the page citations are to the bolded number in the bottom right corner of the page, not to the number in the top right corner as part of the ECF numbering system.

the ALJ for resolution of whether Plaintiff's left shoulder condition constituted a "severe" impairment within the meaning of the Social Security Act and a determination on the persuasiveness of prior administrative medical findings regarding Plaintiff's left shoulder. (*See id.* at 89-93.) The ALJ held a second telephonic hearing on April 25, 2022. (*See id.* at 22.) Plaintiff and a different VE, Victor Alberigi, both testified. (ECF 20, Supplemental R. at 755-780.) The ALJ issued a decision on September 12, 2022, again finding that Plaintiff is not disabled and denying her claim for SSI. (*See id.* at 19-34.)

Plaintiff alleges that she filed a request for review of the ALJ's September 12, 2022 decision on an unspecified date. (*See* ECF 1, Compl. ¶¶ 5, 25.) Plaintiff claims that on August 16, 2023, after a year passed without a decision on her appeal, she visited her local Social Security office and was told that the Commissioner had no record of her second appeal, but also that the Commissioner had not rendered a final decision or administratively closed her petition. (*See id.* ¶¶ 25-26.) While at the Social Security office, Plaintiff prepared a written statement conveying that she "mailed [her] paperwork to Virginia" as required for her second appeal. (*Id.* ¶ 26.) The Appeals Council received the statement Plaintiff prepared at her local Social Security office and treated it as her official appeal. (*See* ECF 16, R. Pt. I at 10.)

On October 19, 2023, the Appeals Council dismissed Plaintiff's request for review as untimely, noting that Plaintiff's request was filed on August 16, 2023, which exceeded the requirement that a request for review be filed within 60 days of an ALJ's decision. (*See id.* at 7-11.)

Thereafter, Plaintiff filed a separate action in this District challenging the Commissioner's denial of her application for SSI, and the Honorable Stewart D. Aaron partially

granted Plaintiff's motion for judgment on the pleadings and remanded to the Commissioner. (*See generally* ECF 1-2, Order on Pl.'s First Mot. for J. on the Pleadings.) On January 15, 2025, the Appeals Council vacated its dismissal of Plaintiff's request for review and acknowledged that "good reason" existed for Plaintiff's "delay in filing [her] request for review." (ECF 16, R. Pt. I at 1.) The Appeals Council nevertheless denied Plaintiff's request for review, finding no basis to change the ALJ's decision. (*See id.*)

On March 11, 2025, Plaintiff filed this action, again appealing the Commissioner's final decision. (*See generally* ECF 1, Compl.) On June 24, 2025, the Commissioner filed a certified copy of the administrative record. (*See generally* ECF 16.) Plaintiff filed her second motion for judgment on the pleadings on August 11, 2025, alleging that the ALJ failed to properly develop the Record, to base her determination of Plaintiff's residual functional capacity ("RFC") on substantial evidence, or to provide an explanation of an adverse determination on Plaintiff's credibility. (*See generally* ECF 18, Pl.'s Mem.) On December 1, 2025, the Commissioner filed his opposition to Plaintiff's motion, asserting that the ALJ's decision was supported by substantial evidence and a sufficiently developed record. (*See generally* ECF 23, Commissioner's Opp.) Plaintiff filed her reply brief on December 9, 2025, reiterating the alleged deficiencies in the ALJ's decision from September 12, 2022. (*See generally* ECF 24, Pl.'s Reply.)

## II.    Administrative Record

### A.    Plaintiff's Background and Symptoms

Plaintiff was born in 1977 and was 48 years old at the time she allegedly became disabled. (*See* ECF 16, R. Pt. I at 32; ECF 18, Pl.'s Mem. at 8.) Her highest level of education is

ninth grade. (*See* ECF 20, Supplemental R. at 775.)[6] At the time of Plaintiff's second hearing on April 25, 2020, Plaintiff had not worked since 2015. (*See id.* at 779.) Plaintiff had previously worked as a cashier at McDonald's and Dollar Tree. (*See* ECF 16, R. Pt. I at 366; ECF 20, Supplemental R. at 779.) In the disability report completed with her SSI application, she alleged disability beginning on June 1, 2015, due to "heart," diabetes, hypertension, neuropathy, and "gastroperisis." (*Id.* at 299.)[7]

B.    Medical Evidence

Plaintiff's alleged onset date is June 1, 2015. (*See id.* at 294.) The earliest medical records in the Record are from 2016. Beginning in 2016, Plaintiff received medical treatment while incarcerated at SCI Muncy in Muncy, Pennsylvania and SCI Cambridge Springs in Cambridge Springs, Pennsylvania in 2017 and 2018. (*See id.* at 390-99, 402-28.) Thereafter, Plaintiff was treated by at least 14 healthcare providers, including a primary care provider and specialists in gastroenterology, cardiology, otolaryngology, orthopedics and rheumatology, vascular surgery, and psychiatry for gastroparesis, congestive heart failure, postpartum cardiomyopathy,[8] chronic obstructive pulmonary disease ("COPD"), hypertension, hyperlipidemia, edema, obesity, diabetes, chronic rhinitis and allergies, tendonitis in her left

---

[6]    Page citations are to the bolded number in the bottom right corner of the page, not to the number in the top right corner as part of the ECF numbering system.

[7]    Gastroparesis is a condition in which the muscles in the stomach do not move food as they should for it to digested. It can cause nausea, vomiting, or belly pain. *See Gastroparesis,* MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/gastroparesis/symptoms-causes/syc-20355787 (last visited April 24, 2026).

[8]    Cardiomyopathy is a disease that "can make your heart stiffen, enlarge or thicken," limiting the heart's ability to pump blood throughout the body. *See Cardiomyopathy,* CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/16841-cardiomyopathy (last visited Mar. 14, 2026).

rotator cuff, and anxiety. (*See* ECF 16-1, R. Pt. II at 430-35, 437-519, 525-28, 535-38, 539-50, 573-85; ECF 16-2, R. Pt. III at 688-98, 718-49). Plaintiff was prescribed various medications, including Lisinopril and Carvedilol for heart failure, Chlorthalidone for edema, Ventolin and Symbicort inhalers for difficulty breathing, and Gabapentin for nerve pain. (ECF 16-1, R. Pt. II at 370-73, 431; ECF 16-2, R. Pt. III at 688-93, 733, 735.)[9]

1.    Treatment History

a.  *SCI Muncy and SCI Cambridge Springs*

Plaintiff received psychiatric treatment at SCI Muncy from Drs. Richard Camacho, Richard Sena, and Staffel Strong in 2016 and 2017, and at SCI Cambridge Springs from Dr. Adam Ligas in 2018. (*See* ECF 16, R. Pt. I at 416-23).[10] The psychiatric treatment notes are partially handwritten, making certain portions difficult to decipher. (*See, e.g., id.* at 416, 423.)

---

[9]    Lisinopril is a medication used in combination with other medication, and Carvedilol is a medication used alone or with other medication, to treat heart failure. *See Lisinopril*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a692051.html (last visited Feb. 15, 2021); *Carvedilol,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a697042.html (Aug. 15, 2023). Chlorthalidone is a medication used to treat edema resulting from heart failure. *Chlorthalidone (oral route),* MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/chlorthalidone-oral-route/description/drg-20071817 (last visited Mar. 1, 2026). Ventolin, a brand-name formulation of Albuterol, is an inhalable medication used to treat respiratory conditions such as COPD. *See Albuterol Oral Inhalation,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a682145.html (last visited Feb. 15, 2016). Symbicort is a brand-name formulation comprised of budesonide and formoterol that is used to treat COPD in adults by preventing respiratory symptoms such as shortness of breath and difficulty breathing. *See Budesonide and Formoterol Oral Inhalation*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a623022.html (June 15, 2023). Gabapentin is a medication used to relieve pain resulting from neurological conditions. *See Gabapentin (oral route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last visited Mar. 1, 2026).

[10]    A portion of these treatment notes are handwritten and difficult to decipher.

Nevertheless, the legible records indicate that Plaintiff was diagnosed with anxiety and received psychiatric medication for some indeterminate amount of time before stopping in or around February 2017. (*See id.* at 422.) As of May 11, 2017, Plaintiff's mood reportedly had stabilized. (*See id.* at 421.)

Plaintiff also received treatment for cardiac and gastrointestinal symptoms from a variety of providers at SCI Muncy and SCI Cambridge Springs in 2017 and 2018. (*See id.* at 385-94, 397-415.)[11] These records indicate that while incarcerated, Plaintiff experienced shortness of breath and chest pain upon exertion, edema, and difficulty walking long distances. (*See id.* at 390, 392, 394, 403.) Plaintiff's medical records from SCI Muncy and SCI Cambridge Springs list her diagnoses as including congestive heart failure, hyperlipidemia, neuropathy, and gastroparesis. (*See id.* at 82, 386, 389, 394, 399.)

Plaintiff underwent diagnostic testing while incarcerated. On February 8, 2018, Plaintiff received radiological imaging on her chest, which revealed "mild cardiomegaly with no acute disease" and "no evidence of congestive heart failure." (*See id.* at 396.)[12] On February 13, 2018, Plaintiff underwent an exercise stress test, where she completed four and a half minutes of exercise before terminating the test due to difficulty breathing. (*See id.* at 395.) This amount of exercise correlated to a workload of six METs, and her Duke treadmill score suggested an "intermediate probability of angiographic coronary disease." (*See id.*)[13]

---

[11]    As with the psychiatric treatment notes, many of these records are handwritten and illegible.

[12]    The Record does not indicate whether the February 8, 2018 imaging on Plaintiff's chest was an x-ray or another form of imaging. (*See* ECF 16, R. Pt. I at 369.)

[13]    In the context of an exercise stress test, a "MET" refers to a "metabolic equivalent of task," which physicians can use to assess a patient's cardiac conditions. *See Viliane Vilcant &*

b.  *Susquehanna Community Health/River Valley Health & Dental Center*

Plaintiff received treatment from Sarah Updegraff, CRNP, at Susquehanna Community Health Center/River Valley Health & Dental Center in Williamsport, Pennsylvania from July 17, 2018 through January 18, 2019. (*See* ECF 16-1, R. Pt. II at 437-522, 673.)[14] At her first appointment, Plaintiff reported swollen legs, shortness of breath when climbing stairs and in hot weather, constipation, and heartburn. (*See id.* at 437.) Plaintiff also indicated that she was not actively looking for a job because of her swollen legs and inability to stand for extended periods. (*See id.*) Updegraff noted that Plaintiff experienced "some neuropathy" in addition to congestive heart failure, gastroparesis, hypertension, hyperlipidemia, obesity, and diabetes. (*See id.* at 438, 440.)

After the initial appointment, Plaintiff attended follow-up appointments with Updegraff on a near-monthly basis through January 2019. (*See id.* at 437-76.) Plaintiff reported fluctuations in her leg swelling, with periodic improvements and flare-ups. (*See id.* at 441, 449, 463, 472.) She also reported that her legs fell asleep, tingled, and felt numb upon sitting for extended periods of time. (*See id.* at 458, 472.) Additionally, Plaintiff described ongoing shortness of breath and chest heaviness. (*See id.* at 441, 449, 463.)

---

*Roman Zeltser, Treadmill Stress Testing,* NATIONAL LIBRARY OF MEDICINE, https://www.ncbi.nlm.nih.gov/books/NBK499903/ (last visited April 8, 2026).

[14]    "CRNP" stands for a Certified Registered Nurse Practitioner, a position in which a "registered nurse[ ] performs acts of medical diagnosis or prescription of medical therapeutic or corrective measures in collaboration with a licensed physician." *See Certified Registered Nurse Practitioner Licensure Requirements Snapshot,* COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF STATE, https://www.pa.gov/agencies/dos/department-and-offices/bpoa/boards-commissions/nursing/certified-registered-nurse-practitioner-licensure-snapshot (last visited April 8, 2026).

At Plaintiff's appointment with Updegraff on September 11, 2018, Updegraff noted that Plaintiff was "not very symptomatic" with respect to her cardiac conditions. (*Id.* at 495.) At her next appointment with Updegraff on October 23, 2018, Plaintiff reported an increase in her energy levels, and her edema had lessened. (*See id.* at 501, 503.) At Plaintiff's visit on December 8, 2018, Updegraff noted that Plaintiff went to the cardiologist and was reportedly told that she was "in good shape." (*Id.* at 506.) At her follow-up appointment on January 18, 2019, Plaintiff reported weakness in her left arm. (*See id.* at 516.) Updegraff also reported that Plaintiff's diabetes was well-controlled, with her A1C down to 5.1%; when she began seeing Updegraff in July 2018, Plaintiff's A1C had been 7.3%. (*See id.* at 441, 472, 475.)[15]

    c.   *Williamsport Regional Medical Center*

On September 3, 2018, Plaintiff was taken by ambulance to Williamsport Regional Medical Center for shortness of breath, chest pain, and lethargy. (*See id.* at 612-614.) Once

---

[15]    An A1C test measures the amount of blood sugar in an individual's blood; an A1C below 5.7% is considered normal, an A1C between 5.7% and 6.4% is considered prediabetic, and an A1C of 6.5% or more is considered diabetic. *See Hemoglobin A1C (HbA1c) Test,* NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/lab-tests/hemoglobin-a1c-hba1c-test/ (last visited April 8, 2026).

The Record reflects that Plaintiff also attended four additional appointments with providers from Susquehanna Community Health Center/River Valley Health and Dental Center. On July 18, 2018, Plaintiff attended her annual gynecological exam with Patricia Green, CRNP. (*See id.* at 483-487.) On August 31, 2018, Plaintiff visited Leonard Weber, PA-C to treat bed bug bites on her legs. (*See id.* at 445-448.) "PA-C" stands for "Physician Assistant-Certified," a licensed medical profession in which providers "diagnos[e] and treat[] common illnesses and work[] with minor procedures." *See Physician Assistant,* Mayo Clinic: College of Medicine and Science, https://college.mayo.edu/academics/explore-health-care-careers/careers-a-z/physician-assistant/ (last visited April 8, 2026). On October 8, 2018, Plaintiff attended another appointment with Weber to treat a sore throat and bilateral ear pain. (*See id.* at 454-457.) On December 12, 2018, Plaintiff saw Christina M. Cables, CRNP for back pain radiating down her right leg and was treated with a Toradol injection. (*See id.* at 468-471.)

Plaintiff arrived at the hospital, she received a chest x-ray, which revealed "[n]o active lung disease." (*See id.* at 521.) Upon physical examination, Plaintiff presented with edema of the lower extremities. (*See id.* at 616.) Plaintiff was discharged from the hospital the same day. (*See id.* at 617, 622.)

On October 30, 2018, Plaintiff underwent an echocardiogram at the Susquehanna Health Heart & Vascular Institute at the Williamsport Regional Medical Center. (*See id.* at 602-03.) The test revealed normal size and grade I diastolic dysfunction in the left ventricle, normal size and systolic function in the right ventricle, and an absence of valvular abnormalities or pericardial effusion. (*See id.* at 602.)

On January 22, 2019, Plaintiff underwent radiological imaging on her left shoulder. (*See id.* at 522-523.)[16] The images revealed "[m]ild inferior subluxation of the humeral head with external rotation" and "laxity of the supporting structures of the glenohumeral joint." (*See id.* at 522.)

### d. Susquehanna Health Gastroenterology

On October 8, 2018, Plaintiff attended a gastroenterology consultation at Susquehanna Health, where she was evaluated by Ashley Roman, PA-C. (*See id.* at 430-35.) At the appointment, Plaintiff reported experiencing intermittent nausea, anemia, and constipation, and indicated that she had been diagnosed with gastroparesis in 2005. (*See id.* at 430.) Having

---

[16]    The Report does not indicate whether the January 22, 2019 imaging on Plaintiff's left shoulder was an x-ray or another form of imaging. (*See* ECF 16-1, R. Pt. II at 522-523.)

concluded that Plaintiff has "GERD [gastroesophogeal reflux disease] without esophagitis" and gastroparesis, Roman ordered a follow-up colonoscopy and endoscopy. (*See id.* at 434.)

Plaintiff underwent a colonoscopy and an endoscopy at Susquehanna Health's Williamsport Regional Medical Center on November 27, 2018. (*See id.* at 573-574, 589, 592.) The tests revealed "moderate diverticulosis," "non-bleeding gastric ulcers," and "non-erosive gastritis." (*See id.* at 590, 593.) The physician who reviewed Plaintiff's endoscopy recommended she follow-up with her gastroenterologist. (*See id.* at 594.)

       *e.  Susquehanna Health Cardiology*

On October 11, 2018, Plaintiff attended her first appointment with Dr. Michael Desiderio, D.O. at Susquehanna Health Cardiology. (*See id.* at 549.) Only one page of the four-page visit report appears to be present in the Record. (*See id.*) That page reflects that Dr. Desiderio described Plaintiff's diagnoses as systolic congestive heart failure and hypertension. (*See id.*)

On November 6, 2018, Plaintiff attended a follow-up appointment with Dr. Desiderio. (*See id.* at 542-45.) Dr. Desiderio reviewed Plaintiff's chest x-ray and echocardiogram and found "no active lung disease" and "Grade I diastolic dysfunction." (*See id.* at 544.)

On December 10, 2018, Plaintiff attended another follow-up appointment with Dr. Desiderio. (*See id.* at 539-41.) Dr. Desiderio reviewed Plaintiff's results from a Stress Chemical Echocardiogram Test and concluded that the results were negative for ischemia. (*See id.* at 541.)

### f. *Susquehanna Health Orthopedics and Rheumatology*

On February 12, 2019, Plaintiff attended an appointment at Susquehanna Health Orthopedics and Rheumatology with Dr. Mark A. Rackish, M.D. (*See id.* at 525-28.) Plaintiff reported ongoing anterior and lateral shoulder pain resulting from an injury sustained at work "several years ago." (*See id.* at 525.) Upon physical exam, Plaintiff was found to "lack[ ] 30 degrees of forward elevation and abduction" in her left shoulder, and an x-ray revealed rotator cuff tendonitis. (*See id.* at 527-28.) Plaintiff was treated with a Kenalog injection in her left shoulder. (*See id.* at 525.)

### g. *Susquehanna Health Vascular Surgery*

On February 22, 2019, Plaintiff attended an appointment with Dr. J. Franklin Oaks Jr., D.O., at Susquehanna Health Vascular Surgery. (*See id.* at 535-538.) Plaintiff reported leg pain and swelling. (*See id.* at 535, 538.) Plaintiff underwent a vascular ultrasound of her legs; Dr. Oaks did not indicate any affirmative findings, although he did note Plaintiff's history of peripheral vascular disease. (*See id.* at 557-59.)

### h. *Dr. Ilya Kaplan, M.D./Cardiac Care of NY*

On February 13, 2020, Plaintiff attended her first appointment with Dr. Ilya Kaplan, M.D., a cardiologist at Cardiac Care of NY. (*See* ECF 16-2, R. Pt. III at 688.) Dr. Kaplan described Plaintiff as "doing fairly well" and noted that her "history of severe postpartum cardiomyopathy" had reached "complete resolution" under her current medication regimen. (*See id.* at 688-89.) Plaintiff expressed a desire to become pregnant again, which Dr. Kaplan advised against, given Plaintiff's history of postpartum cardiomyopathy. (*See id.*) Dr. Kaplan

12

encouraged Plaintiff to continue taking her medications as prescribed and requested to follow up with Plaintiff in a year. (*See id.* at 689.)

On February 11, 2021, Plaintiff attended a follow-up appointment with Dr. Kaplan. (*See id.* at 690.) At the appointment, Plaintiff denied chest pain, shortness of breath, or changes in her exercise tolerance. (*See id.*) Plaintiff's legs did not show signs of edema. (*See id.*) Dr. Kaplan concluded that Plaintiff experienced "significant resolution of her cardiomyopathy on her current medication regimen" and described her as "currently asymptomatic." (*See id.* at 691.)

On October 25, 2021, Plaintiff attended another follow-up appointment with Dr. Kaplan. (*See id.* at 692.) Once again, Plaintiff did not present with edema. (*See id.* at 693.) Dr. Kaplan reiterated that Plaintiff's current medication regimen significantly resolved her cardiomyopathy and discouraged Plaintiff from getting pregnant again. (*See id.*)

      *i.   Dr. Jonathan C. Smith, M.D./ENT and Allergy Associates, LLP*

On May 13, 2021, Plaintiff attended her initial appointment with Dr. Jonathan C. Smith, M.D. of ENT and Allergy Associates, LLP. (*See id.* at 718.) Dr. Smith described Plaintiff as having a history of COPD and smoking. (*See id.*) Plaintiff was diagnosed with laryngopharyngeal reflux and chronic rhinitis. (*See id.* at 721-22.)

Plaintiff attended a subsequent appointment at ENT and Allergy Associates, LLP on August 20, 2021, where she underwent allergy and hearing testing. (*See id.* at 729-49.) Dr. Smith concluded that Plaintiff has seasonal and perennial allergic rhinitis and gastro-esophageal reflux disease. (*See id.* at 745.)

2. Medical Opinion Evidence

    *a. David Guttman, M.D.*

On May 7, 2019, Dr. David Guttman, M.D. evaluated Plaintiff upon referral by the Division of Disability Determination. (*See* ECF 16-1, R. Pt. II at 669.) Dr. Guttman described Plaintiff as experiencing diabetic neuropathy and diabetic gastroparesis. (*See id.*) Plaintiff reported shortness of breath after walking half a block or climbing four stairs, in addition to pitting edema. (*See id.*)[17] Dr. Guttman conducted a physical examination and found that Plaintiff had a full range of motion in both shoulders, 5/5 strength in her upper and lower extremities, and pitting edema in her extremities. (*See id.* at 671.) Dr. Guttman concluded that Plaintiff has diabetes with neuropathy and gastroparesis, cardiomyopathy with congestive heart failure, and hypertension. (*See id.* at 672.) Dr. Guttman opined that Plaintiff's prognosis is fair and that she "should avoid activities requiring mild or greater levels of exertion secondary to cardiac history." (*Id.* at 672.)

    *b. R. Abueg, M.D.*

At the initial level, medical consultant Dr. R. Abueg, M.D. reviewed Plaintiff's medical records and opined on her condition on June 10, 2019; Dr. Abueg did not examine Plaintiff. (*See* ECF 16, R. Pt. I at 32, 47-58.) Dr. Abueg concluded that Plaintiff can occasionally lift or carry up to 20 pounds, frequently lift or carry up to 10 pounds, and stand, walk, or sit with normal breaks for about six hours in an eight-hour workday. (*See id.* at 55.) Dr. Abueg also noted

---

[17]    Pitting edema is "a type of swelling where pressing on a swollen body part leaves behind a dent or pit that takes time to refill." *What Is Pitting Edema?,* CLEVELAND CLINIC, https://my.clevelandclinic.org/health/symptoms/pitting-edema (last visited April 8, 2026).

limitations on Plaintiff's ability to lift her left arm over her head. (*See id.*) Dr. Abueg opined that

Plaintiff is not disabled. (*See id.* at 58.)

### c.  S. Putcha, M.D.

At the reconsideration level, medical consultant Dr. S. Putcha, M.D. reviewed Plaintiff's

medical records and opined on her condition on August 28, 2019; Dr. Putcha did not physically

examine Plaintiff. (*See id.* at 60-71.) Dr. Putcha concluded that Plaintiff can occasionally lift or

carry up to 20 pounds, frequently lift or carry up to 10 pounds, and stand, walk, and sit with

normal breaks for about six hours in an eight-hour workday. (*See id.* at 67-68.) Dr. Putcha also

noted limitations on Plaintiff's ability to lift her left arm over her head. (*See id.* at 68.) Dr.

Putcha concluded that Plaintiff is not disabled. (*See id.* at 70.)

### C.    The ALJ Hearings

#### 1.    The ALJ Hearing on June 17, 2020

On June 17, 2020, Plaintiff appeared pro se at the telephonic hearing before the ALJ.

(*See id.* at 189-207.) At the time of the first hearing, Plaintiff was living in the Bronx with her

husband. (*See id.* at 195.) She testified that she can walk up and down the steps without

stopping. (*See id.* at 197.) Plaintiff estimated that she can stand for about 30 minutes at a time,

but she also noted that her feet are "constantly" swollen and have a "tingling, burning

sensation" that makes it difficult to stand for extended periods of time. (*See id.* at 199.) Plaintiff

testified that since starting new medication for her COPD, she can walk for a block and a half

before needing to sit down. (*See id.* at 200.) Plaintiff also stated that sitting for extended

periods of time can be difficult because her back "freeze[s] up"; she estimated that she can sit

for about 10 minutes at a time. (*See id.*) Moreover, Plaintiff estimated that she can lift about 10 pounds. (*See id.*)

Regarding her employment history, Plaintiff testified that she has not worked since 2015, when she lost her job as an assistant manager due to her arrest and eventual conviction. (*See id.* at 194-95.) Plaintiff described her COPD and breathing as the condition with the largest impact on her ability to work. (*See id.* at 196.) Plaintiff testified that "everything is basically a struggle," including daily tasks like brushing her teeth, and that she tires easily. (*Id.* at 196, 199.)

A VE appeared at the first hearing and testified about Plaintiff's capacity to perform jobs available in the national economy. (*See id.* at 202-04.) At the outset of the VE's testimony, the ALJ stated her belief that Plaintiff had no past relevant work. (*See id.* at 203.) The ALJ asked the VE to answer questions about a hypothetical individual of the same age, education, and past work as Plaintiff, with the following physical limitations: the hypothetical individual "can occasionally balance, stoop, crouch, kneel, crawl, and climb ramps and stairs," can "never climb ladders, ropes, or scaffolds" and "can tolerate no more than occasional exposure to respiratory irritants." (*See id.*)

When asked if there are enough unskilled jobs in the national economy available for someone of Plaintiff's age, education, past work experience, and limitations, the VE identified the jobs of addresser, DOT No. 209.587-010; sorter, DOT No. 521.687-086; and ticket checker, DOT No. 219.587-101. (*See id.* at 204.) When the ALJ inquired as to the impact of an additional limitation that the individual "be off task more than 20 percent of the time in an eight-hour workday," the VE testified that this would "preclude all work." (*See id.*)

16

On August 25, 2020, the ALJ issued a decision finding that Plaintiff is not disabled and denying her claim for SSI. (*See id.* at 73-84.) Plaintiff filed a request for review on October 1, 2020 (*see id.* at 208), and the Appeals Counsel granted her request on January 20, 2022. (*See id.* at 91-93.) Thereafter, the ALJ scheduled Plaintiff's second hearing for April 25, 2022. (*See id.* at 239.)

      2.    The ALJ Hearing on April 25, 2022

On April 25, 2022, Plaintiff again appeared pro se at the telephonic hearing before the ALJ. (*See* ECF 20, Supplemental R. at 755-81.)

At the beginning of the hearing, when asked why she has been unable to work since filing her application for SSI in December 2018, Plaintiff testified that she is limited by her shoulder and shortness of breath. (*See id.* at 760.) Specifically, Plaintiff stated that she must "constantly stop to catch her breath," while completing basic tasks, such as getting dressed. (*Id.*) Plaintiff indicated that she can walk half a block without needing to stop and take a break, stand for 10 minutes, and sit for 15 minutes. (*I.*) When asked to describe a typical day in her life, Plaintiff explained that she wakes up, brushes her teeth, rests, makes microwavable meals, rests again, takes a shower, and then makes another microwaveable meal. (*See id.* at 763.) Plaintiff's husband is responsible for most household chores, including cooking and shopping. (*See id.*)

Plaintiff stated that she can only lift "about a can" on her left side and a maximum of about 10 pounds on her right side. (*Id.* at 760.) Plaintiff described having a limited range of motion on her left side since 2018, testifying that she can lift her left hand "not even quite above [her] head." (*Id.* at 761.) Plaintiff testified that physical therapy and exercise are the only

17

treatment she can receive for her shoulder, because medication would conflict with the prescriptions she takes for her heart. (*See id.* at 761, 764.) She acknowledged that she also received an injection for her shoulder but cannot take any additional pain medication, because it would interfere with her respiratory issues. (*See id.* at 764.)

Plaintiff agreed that at the time of the second hearing, she was taking medications to alleviate pain (Tylenol, Morphine, Gabapentin), breathing difficulties (Albuterol, Symbicort) high blood pressure (Amlodipine), edema (Furosemide), and heart failure (Carbodiol, Lisinopril). (*See id.* at 761-62.) She denied experiencing any side effects from her medication. (*See id.* at 762.) Plaintiff stated that she has fibromyalgia, which causes her to be in constant pain, but that she has foregone fibromyalgia treatment to concentrate on her cardiac conditions and medication. (*See id.* at 762-63.) When asked if any other conditions impact her ability to work, Plaintiff also raised her "severe allergy" that can flare up and affect her daily activity on a seasonal basis. (*Id.* at 765-66.) Plaintiff acknowledged her history of living with anxiety disorder and testified that she attends therapy but does not take anti-anxiety medication or antidepressants. (*See id.* at 766-67.)

A different VE appeared at the second hearing and testified about Plaintiff's ability to perform jobs available in the national economy. (*See id.* at 767-78.) The ALJ asked a series of questions based on a hypothetical individual of the same age, education, and past work experience as Plaintiff with the following physical limitations: she can tolerate no more than occasional exposure to respiratory irritants; can occasionally reach overhead in all directions with the left upper non-dominant extremity; can occasionally balance on uneven terrain and

18

can balance on even terrain without limitation; can occasionally stoop, crouch, kneel, crawl, and climb ramps and stairs; and can never climb ladders, ropes, or scaffolds. (*See id.* at 770.)

The VE testified that an individual with such limitations could perform semi-skilled jobs such as telemarketer, DOT No. 299.357-014, or dispatcher, DOT No. 913.367-010, or unskilled jobs such as document clerk, DOT No. 249.587-018; envelope clerk, DOT No. 209.587-010; or call out operator, DOT No. 237.367-014. (*See id.* at 770-71.) When asked whether the hypothetical individual would be able to perform any work if she had the additional limitation of being "off task more than 20% of the time in an eight-hour workday," the VE testified that they would not be able to work. (*See id.* at 771.)

The ALJ asked follow-up questions concerning the hypothetical individual's ability to work if she could occasionally reach overhead and in all other directions with the left non-dominant upper extremity. (*See id.* at 771-72.) The VE concluded that call out operator would still be possible, but he seemed to cast doubt on the viability of the document clerk and envelope clerk jobs. (*See id.* at 772.) Nonetheless, the VE identified two other jobs that required only occasional reaching: surveillance system monitor, DOT No. 379.367-010 and election clerk, DOT No. 205.367-030. (*See id.* at 772-73.) The VE testified that the hypothetical individual could also still perform appointment clerk and dispatcher roles. (*See id.* at 773-74.)

Thereafter, Plaintiff pointed out that the telemarketer and dispatcher roles "require a lot of reading" and asked the VE whether he considered Plaintiff's ninth-grade education. (*Id.* at 775.) Plaintiff testified that she can read and write in English. (*See id.* at 776.) In response, the VE acknowledged that the vocational reference materials "don't necessarily give us a perfect way" of classifying Plaintiff's level of education. (*Id.*) The VE discussed a general education scale

called the Guide for Occupational Exploration, which describes Plaintiff as having the functional

equivalent of a seventh to eighth grade education level. (*See id.* at 777.) Nonetheless, the VE

confirmed that a theoretical individual with this level of education could perform the jobs he

identified in his testimony. (*See id.* at 777-78.)

On September 12, 2022, the ALJ issued a decision concluding that Plaintiff is not

disabled and denying her claim for SSI. (*See* ECF 16, R. Pt. I at 27-39.)

## DISCUSSION

### I.    Legal Standards

#### A.    Legal Standard for Deciding a Motion for Judgment on the Pleadings

"Under Rule 12(c), a party is entitled to judgment on the pleadings if she establishes

that no material facts are in dispute and that she is entitled to judgment as a matter of law."

*Rosario v. Comm'r of Soc. Sec.*, No. 20-CV-7749 (SLC), 2022 WL 819810, at *5 (S.D.N.Y. Mar. 18,

2022) (citing *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999) and *Morcelo v. Barnhart*, No.

01-CV-0743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003)).

#### B.    Legal Principles Governing Judicial Review of the Commissioner's Decision

A district court may affirm, modify, or reverse (with or without remand) a final decision

of the Commissioner. *See* 42 U.S.C. § 405(g); *Skrodzki v. Comm'r of Soc. Sec.*, 693 F. App'x 29, 29

(2d Cir. 2017). The inquiry is "whether the correct legal standards were applied and whether

substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).

"Failure to apply the correct legal standard constitutes reversible error . . . ." *Douglass v.*

*Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir.

2008)). In "certain circumstances, failure to adhere to the applicable regulations" counts as a

20

failure to apply the correct legal standard and therefore is reversible error. *Douglass*, 496 F. App'x at 156 (quoting *Kohler*, 546 F.3d at 265). Courts review de novo whether the ALJ's legal conclusions were based on the correct legal principles. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (reversing where the ALJ's decision "was not in conformity with the regulations promulgated under the Social Security Act").

If a court concludes that the ALJ used the correct legal standards, the court must then "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam). The substantial evidence standard is quite deferential: "once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448. If the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's conclusion. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982). A court "may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991).

However, a court may not defer to a determination by the ALJ if it is the product of legal error, including a failure to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based," 42 U.S.C. § 405(b)(1). While the ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010), the ALJ may not ignore or

mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (awarding legal fees when the ALJ had ignored or mischaracterized evidence); *Kohler*, 546 F.3d at 268-69 (holding that remand was appropriate when the ALJ had overlooked and mischaracterized evidence); *Ruiz v. Barnhart*, No. 01-CV-1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (remanding when the ALJ had ignored evidence). Therefore, in assessing whether there is substantial evidence to support the ALJ's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013).

When "the ALJ has applied an improper legal standard," or when there is not substantial evidence to support the ALJ's determination, the reviewing court may remand to the ALJ to develop the record. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

C.    <u>Legal Principles Guiding the Commissioner's Determination of Disability</u>

Under the Act, a person who has a disability and is insured for disability benefits is entitled to disability benefits. *See* 42 U.S.C. §§ 423(a)(1)(A); 20 C.F.R. §§ 404.101, 404.120, 404.315(a). The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In determining whether impairments meet the statutory definition of disability, the ALJ "must make a thorough inquiry into the claimant's condition and must be mindful that the Social Security Act is a remedial statute, to be broadly construed and liberally applied." *Mongeur*, 722 F.2d at 1037. Accordingly, the ALJ's decision must consider factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.*

### 1.  Five-Step Inquiry

The Commissioner must conduct a five-step inquiry to determine whether an individual is disabled and therefore entitled to disability benefits. *See* 20 C.F.R. § 404.1520(a)(1). First, the Commissioner must determine whether the claimant is currently engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), (b). If so, the claimant is ineligible for benefits and the inquiry ends.

If the claimant is not engaged in any such activity, the Commissioner moves on to the second step and must determine whether the claimant has a severe impairment, which is an impairment or combination of impairments that significantly limits his ability to perform basic work activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). If the claimant does not have an impairment or combination of impairments that are severe, the claimant is not entitled to benefits and the inquiry ends.

If the claimant has a severe impairment or combination of impairments, the Commissioner continues to step three and must determine whether the impairment or combination of impairments is, or medically equals, one of the impairments included in the

23

"listings" of qualifying disabilities contained at 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. If the claimant's impairment or impairments meet or medically equal one of those listings, the Commissioner presumes the claimant is disabled, and the claimant will be eligible for benefits. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

If the claimant does not meet the criteria for being presumed disabled, the Commissioner continues to the fourth step and must assess the claimant's residual functional capacity ("RFC"), which is the ability to perform work activities on a sustained basis despite her impairments. The Commissioner then determines whether the claimant possesses the RFC to perform the claimant's past work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), (f), (h). If so, the claimant is not eligible for benefits and the inquiry ends.

If the claimant is not capable of performing her prior work, the Commissioner must continue to step five and determine whether the claimant can perform other available work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), (g), (h). If the claimant, as limited by her RFC, can perform other available work, the claimant is not entitled to benefits. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), (v).

The claimant bears the burden of proof for the first four steps. *See Selian,* 708 F.3d at 418. If the claimant shows that she is unable to perform her past work, the Commissioner bears the burden of showing at the fifth step that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater,* 142 F.3d 75, 80 (2d Cir. 1998); *see also* 20 C.F.R.§§ 404.1520(a)(4)(iv), (v).

2. Evaluation of Medical Opinion Evidence

The regulations set forth in 20 C.F.R. § 404.1520c apply to claims filed on or after March 27, 2017. Under these regulations, a treating doctor's opinion is no longer entitled to a presumption of controlling weight. Instead, all medical opinions are evaluated for their persuasiveness. *See* 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from your medical sources").[18] "Although the new regulations eliminate the perceived hierarchy of medical sources . . . the ALJ must still articulate how [he or she] considered the medical opinions and how persuasive [he or she] find[s] all of the medical opinions." *Amber H. v. Saul*, No. 20-CV-490 (ATB), 2021 WL 2076219, at *4 (N.D.N.Y. May 24, 2021) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1), 416.920c(a), (b)(1)) (alterations in original). These regulations place the most significance for the persuasiveness assessment on the extent to which a physician's opinion is supported by well-accepted medical evidence and consistent with the rest of the record. *See* 20 C.F.R. § 404.1520c(a) ("The most important factors we consider when we evaluate the persuasiveness of medical opinions . . . are supportability . . . and consistency."). "[S]upportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion," *Aponte v. Kijakazi*, 692 F. Supp. 3d 257, 265 (S.D.N.Y. 2023), whereas "consistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record[.]" *Id.*

---

[18]    For claims filed prior to March 27, 2017, a different standard applied, under which ALJs were required to give deferential weight to opinions rendered by claimants' treating physicians. 20 C.F.R. § 404.1527(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).

Beyond merely considering the supportability and consistency of medical source opinions, the ALJ must explain how he analyzed those factors. *See* 20 C.F.R. § 404.1520c(b)(2); *Vellone v. Saul*, No. 20-CV-0261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) ("[I]n cases where the new regulations apply, an ALJ must explain his/her approach with respect to the first two factors when considering a medical opinion"), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021). In most instances, the ALJ may, but is not required to, discuss the other *Burgess* factors (relationship with the claimant, specialization, and other relevant factors). *See* 20 C.F.R. § 404.1520c(b)(2).

Under the current regulations, an ALJ's failure to properly consider and apply the consistency and supportability factors may be a basis for remand. *See, e.g., Rivera v. Comm'r of Soc. Sec.*, No. 19-CV-4630 (LJL) (BCM), 2020 WL 8167136, at *22 (S.D.N.Y. Dec. 30, 2020) (remanding so that the ALJ could "reevaluate the persuasiveness assigned to the opinion evidence of record and explicitly discuss both the supportability and the consistency of the consulting examiner's opinions"), *report and recommendation adopted*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021); *Andrew G. v. Comm'r of Soc. Sec.*, No. 19-CV-0942 (ML), 2020 WL 5848776, at *5-9 (N.D.N.Y. Oct. 1, 2020) (remanding due to the ALJ's failure to adequately explain the supportability or consistency factors that led to the decision); *see also* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). A court need not remand the case if the ALJ committed only harmless error, such that the "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala*, 595 F.3d at 409.

As Plaintiff's application post-dates March 27, 2017, the Court must apply the revised regulations on evaluating medical opinions.

### 3. Evaluating Plaintiff's Credibility

SSA regulations provide that statements of subjective pain and other symptoms, standing alone, cannot establish disability. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). The ALJ must follow a two-step framework for evaluating allegations of pain and other symptoms. *See Genier*, 595 F.3d at 49. The ALJ first considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the alleged symptoms. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Genier*, 595 F.3d at 49 (citing 20 C.F.R. § 404.1529(a)). Among the additional kinds of evidence that an ALJ must consider in addition to objective medical evidence are the "individual's daily activities"; the "location, duration, frequency and intensity" of the pain; the type and effectiveness of any medication the individual takes to alleviate pain; other treatments the individual has received for relief of pain; and any other measures the individual uses to relieve pain, such as lying down. *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *11 (S.D.N.Y. Dec. 3, 2008).

If the ALJ's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain. *See McLaughlin v. Sec'y of Health, Educ. & Welfare,* 612 F.2d 701, 704-05 (2d Cir. 1980). However, "[t]he Second Circuit has held that where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the

27

record." *Pena*, 2008 WL 5111317, at *10 (quoting *Williams v. Bowen,* 859 F.2d 255, 260-61 (2d

Cir. 1988)).

> 4. The ALJ's Duty To Develop the Administrative Record

Disability-benefits proceedings are non-adversarial, and so the ALJ has an affirmative

obligation to develop a complete administrative record, even if the claimant is represented by

counsel. *See Lamay v. Astrue*, 562 F.3d 503, 508-09 (2d Cir. 2009). Whether the ALJ discharged

this duty "is a threshold issue." *Romero v. Comm'r of Soc. Sec.*, No. 18-CV-10248 (KHP), 2020 WL

3412936, at *12 (S.D.N.Y. June 22, 2020).

"[T]he record as a whole must be complete and detailed enough to allow the ALJ to

determine the claimant's residual functional capacity." *Rosario,* 2022 WL 819810, at *6

(S.D.N.Y. Mar. 18, 2022). "If a gap exists in the administrative record[,] then the plaintiff has not

been afforded a full and fair hearing and the ALJ has failed in his or her duty to develop the

administrative record." *Dufresne v. Astrue*, No. 12-CV-049 (MAD) (TWD), 2013 WL 1296376, at

*5 (N.D.N.Y. Mar. 8, 2013) (citing *Hankerson v. Harris*, 636 F.2d 893, 897 (2d Cir. 1980)), *report

and recommendation adopted*, 2013 WL 1289759 (N.D.N.Y. Mar. 27, 2013). Under those

circumstances, a court will remand the case for further development of the evidence or for

more specific findings. *See Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).

## II.    The ALJ's Decision

On September 12, 2022, in a 13-page decision, the ALJ concluded that Plaintiff was not

disabled based on her application for SSI filed on December 3, 2018. (*See* ECF 16, R. Pt. I at 22-

34.) In rendering her decision, the ALJ applied the five-step sequential evaluation.

A.    <u>Step One</u>

At Step One of the five-step inquiry, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the application date of December 3, 2018 through the date of the decision. (*See id.* at 23, 25.)

B.    <u>Step Two</u>

At Step Two, the ALJ concluded that Plaintiff has the following severe impairments: congestive heart failure, cardiomyopathy, COPD, diabetes, obesity, hypertension, peripheral neuropathy, and degenerative joint disease in the left and non-dominant upper extremity. (*See id.* at 25.)

C.    <u>Step Three</u>

At Step Three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments equaling the severity of any of the listed impairments. (*See id.* at 27.) In undertaking this third step of the five-step analysis, the ALJ reviewed 20 C.F.R. 416.920(d), 416.925, and 416.926, and noted that Plaintiff denies using a cane or having a sensory deficit. (*See id.*)

D.    <u>Determining Plaintiff's RFC and Step Four</u>

1. Analysis of Plaintiff's Report of Her Symptoms

Prior to evaluating Step Four, the ALJ determined Plaintiff's RFC. In making this assessment, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," including "the medical opinion(s) and prior administrative medical filing(s)." (*See id.*) The ALJ found that while Plaintiff's "medically determinable impairments could reasonably be expected

to cause the alleged symptoms," Plaintiff's statements regarding "the intensity, persistence, and limiting effects" of her symptoms were "not entirely consistent" with the Record. (*See id.* at 28.) In support of this adverse credibility determination, the ALJ merely noted that the treatment notes from Plaintiff's cardiologist, Dr. Kaplan, indicated that Plaintiff's cardiomyopathy was asymptomatic and that the Record lacked evidence to suggest that Plaintiff's neuropathy caused severe limitations. (*See id.*)

### 2. Analysis of Plaintiff's Treating Physician Opinions

The ALJ also summarized and analyzed Plaintiff's clinical treatment records from February 2017 through October 2021. (*See id.* at 28-31.) The ALJ began with Plaintiff's medical records from the correctional facilities in Pennsylvania, contrasting Plaintiff's reports of edema, shortness of breath, and chest pain with the healthcare provider's finding that Plaintiff's congestive heart failure was "well controlled." (*Id.* at 28-29.) Thereafter, the ALJ turned to Plaintiff's records from the Susquehanna Community Health Center and the Williamsport Regional Medical Center emergency room, emphasizing the findings that Plaintiff was "not very symptomatic" with respect to her cardiac symptoms and the cardiologist's reported comment that Plaintiff is "in good shape." (*See id.* at 29.) The ALJ specifically relied on the treatment reports from Dr. Kaplan, who opined that Plaintiff's cardiomyopathy had reached significant resolution with her medication regimen. (*See id.* at 30.) The ALJ also noted Dr. Kaplan's report from February 2021, in which Plaintiff denied shortness of breath or chest pain and did not present with edema. (*See id.*) The ALJ concluded that Plaintiff's medical records demonstrated an improvement in her cardiomyopathy and edema, such that "neither would interfere with the [Plaintiff's] ability to do the narrowed range of sedentary exertion." (*See id.*)

30

Next, the ALJ turned to Plaintiff's diabetes and neuropathy. (*See id.* at 30-31.) The ALJ referenced the treatment notes from Susquehanna Community Health Center demonstrating a significant improvement in Plaintiff's diabetes. (*See id.*) As to Plaintiff's neuropathy, the ALJ noted that while Plaintiff claimed her neuropathy was worsening in January 2019, Plaintiff reported having no sensory deficit in her upper or lower extremities in May 2019. (*See id.* at 31.) The ALJ found that "there is little to indicate that the [Plaintiff] would be unable to do sedentary exertion due to these impairments." (*Id.*)

Finally, the ALJ addressed Plaintiff's history of left shoulder pain. (*See id.*) The ALJ emphasized that Plaintiff did not report her left shoulder pain until December 2018, when she initially complained of weakness in her left arm. (*See id.*) There was some evidence in the Record to suggest that Plaintiff had a limited range of motion on her left upper extremity, including a treatment report from Dr. Rackish, who concluded that Plaintiff's range of motion lacked 30 degrees. (*See id.*) But the ALJ also contrasted this report with Plaintiff's consultative physical examination, discussed in greater detail below, in which the examining physician, Dr. Guttman, found that Plaintiff had full range of motion. (*See id.*) The ALJ determined that "limiting the [Plaintiff] to only occasional overhead reaching and frequent reaching otherwise adequately addresses [Plaintiff's] left shoulder pain." (*Id.*)

### 3.  Analysis of the Consulting Evaluations

After considering the opinions of Plaintiff's treating providers, the ALJ turned to the consultative medical evidence in the Record. (*See id.* at 32.) First, the ALJ referenced the opinion of the non-examining state physician, who limited Plaintiff to light exertion and occasional overhead reaching. (*See id.*) The ALJ found the limitations on reaching to be

31

persuasive but otherwise found that Plaintiff "is limited to sedentary exertion give [sic] her heart disease." (*See id.*) The ALJ also discussed the report of Dr. Guttman, who opined that Plaintiff should avoid "mild or greater levels of exertion." (*See id.*) Noting that Dr. Guttman failed to define "mild or greater levels of exertion," the ALJ concluded that Dr. Guttman's opinion was only persuasive to the extent that it was consistent with sedentary exertion. (*See id.*)

After reaching a conclusion about Plaintiff's RFC, the ALJ found at Step Four that Plaintiff has no past relevant work. (*See id.*)

E.    Step Five

At Step Five, after considering Plaintiff's age, education, work experience, and RFC, the ALJ concluded that there were jobs that exist in sufficient numbers in the national economy that Plaintiff could perform, including jobs such as telemarketer, dispatcher, and appointment clerk. (*See id.* at 32-33.) Accordingly, the ALJ concluded that Plaintiff had not been under a disability since the date the application was filed on December 3, 2018. (*See id.* at 33-34.)

III.   Analysis

A reviewing court must decide whether the ALJ applied the correct legal standard. *See Calvello v. Barnhart*, No. 05-CV-4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008), *report and recommendation adopted*, 2008 WL 4449357 (S.D.N.Y. Oct. 1, 2008). If there was legal error, the reviewing court must assess whether the error was harmless. *See Townley*, 748 F.2d at 112. If there was no legal error, or if any such error was harmless, the reviewing court must determine whether the ALJ's decision was supported by substantial evidence. *See id.* Setting aside the decision and remanding is appropriate where the record was

32

not fully developed, or where any legal error was not harmless, or where the decision was not supported by substantial evidence. *See McClean v. Astrue*, 650 F. Supp. 2d 223, 226 (E.D.N.Y. 2009) (citing *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)).

Plaintiff raises three objections to the Commissioner's decision: (1) that the ALJ violated her duty to develop the medical record by failing to obtain evidence about Plaintiff's breathing difficulties; (2) that the ALJ's RFC determination was not supported by substantial evidence; and (3) that the ALJ failed to provide any basis for an adverse credibility determination to discount Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her varying symptoms. (*See* ECF 18, Pl.'s Mem. at 13-20.) The Commissioner counters that the ALJ adequately considered Plaintiff's COPD and congestive heart failure and developed the record, and that, to the extent Plaintiff seeks to rely on after-acquired evidence submitted to the Appeals Council, such evidence did not relate to the relevant period or change the weight of the evidence. (*See* ECF 23, Commissioner's Opp. at 8-21.) In her reply brief, Plaintiff reiterates that the ALJ failed to integrate Plaintiff's well-documented respiratory symptoms into her RFC, supplement the administrative record with medical opinion evidence regarding Plaintiff's difficulty breathing, and explain the basis for her adverse determination on Plaintiff's credibility. (*See* ECF 24, Pl.'s Reply at 2-7.)

For the reasons set forth below, I conclude that the ALJ failed to develop the medical record, failed to integrate Plaintiff's severe respiratory impairments in assessing her RFC, and failed to substantiate her adverse credibility determination with the requisite specificity. Thus, I respectfully recommend that Your Honor should grant Plaintiff's motion for judgment on the pleadings and remand this case for further administrative proceedings.

A.        The ALJ's Failure to Develop the Medical Record Warrants Remand

I begin by assessing the threshold issue of whether the ALJ discharged her duty to develop the medical record.

Plaintiff argues that the ALJ failed to fulfill her duty to supplement the medical record with a medical source statement or additional medical opinions discussing the functional limitations caused by her impairments. (*See* ECF 18, Pl.'s Mem. at 16-18.) Defendant counters that the Record was adequately developed and had no obvious gaps, such that the ALJ was not required to request any additional information to supplement the existing Record. (*See* ECF 23, Commissioner's Opp. at 15-18.) Furthermore, Defendant notes that while an ALJ has an affirmative duty to develop the record, "Plaintiff overlooks that she had the burden to produce evidence proving that she was disabled." (*Id.* at 16.) In her reply brief, Plaintiff reiterates that the ALJ failed to fulfill her "affirmative duty" to properly develop the record with medical opinion evidence, particularly as to Plaintiff's respiratory conditions. (*See* ECF 24, Pl.'s Reply at 6-7.)

Courts in this Circuit have consistently held that an ALJ violates her duty to develop the record if she makes an RFC determination when no functional assessment exists in the record, or when any such assessments are insufficient and she does not request a functional assessment. *See Romero*, 2020 WL 3412936, at *12 (collecting cases); *Brooks v. Kijakazi*, No. 20-CV-7750 (GBD) (JLC), 2022 WL 213994, at *17 (S.D.N.Y. Jan. 25, 2022) (applying the same principle under current regulations, which revised the treating physician rule), *report and recommendation adopted*, 2022 WL 715424 (S.D.N.Y. Mar. 10, 2022); *Acosta Cuevas*, 2021 WL 363682, at *11 (remanding because the ALJ fell "well short of [her] duty to develop at least a

34

[12]-month period of [the] plaintiff's medical history"); *Newton v. Berryhill*, No. 18-CV-1244

(MPS), 2019 WL 4686594, at *2 (D. Conn. Sept. 26, 2019) (finding that the ALJ was required to

inquire further to "understand why a treating physician believed that [the claimant's] ability to

work was impeded – at least where there was no function-by-function analysis from a treating

physician and . . . no information whatsoever from any medical source for nearly half of the

relevant time period").

"[D]espite the new regulations, an ALJ's duty to develop the record takes on heightened

importance with respect to a claimant's treating medical sources, because those sources are

likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a

claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical findings alone or from reports of individual

examinations." *Brooks,* 2022 WL 213994, at *17; *Gene L. v. Comm'r of Soc. Sec.*, No. 20-CV-0152

(CR), 2022 WL 178968, at *6 (D. Vt. Jan. 20, 2022) (explaining that, "[a]lthough an ALJ need

not defer to the opinions of a claimant's treating sources under the [SSA's] new regulations, the

new regulations do not lessen an ALJ's duty to develop the record").

An ALJ's failure to request a functional assessment from a treating physician or to

request a more recent functional assessment may be harmless, and thus no remand is

warranted, in cases where "the record contains sufficient evidence from which an ALJ can

assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x

29, 34 (2d Cir. 2013). For example, remand may not be necessary when the ALJ rejects the

medical opinion evidence in the record, but the RFC determination is supported by substantial

35

evidence of functional capacity from "contemporaneous treatment notes." *Monroe v. Comm'r of Soc. Sec.*, 676 Fed. App'x 5, 8-9 (2d Cir. 2017).

But "[a] decision not to remand assumes that there are no obvious gaps in the record precluding the ALJ from properly assessing the claimant's residual functional capacity." *Brooks*, 2022 WL 213994, at *17; *see also Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (explaining that the ALJ was obligated to develop the record when there were "obvious gaps"). Courts uphold an ALJ's RFC assessment "only where the record is clear and, typically, where there is *some* useful assessment of the claimant's limitations from a medical source." *Staggers v. Colvin*, No. 14-CV-0717 (JCH), 2015 WL 4751123, at *3 (D. Conn. Aug. 11, 2015). To satisfy the duty to develop the record, "an ALJ should have medical evidence from a medical source with a sufficiently persuasive opinion noting the existence and severity of a disability." *Brooks*, 2022 WL 213994, at *17.

The Record contains three functional assessments, including one from the consulting examiner, Dr. Guttman, dated May 7, 2019, and two from the non-examining state physicians, Drs. Abueg and Putcha, dated June 10, 2019 and August 28, 2019. (*See* ECF 16, R. Pt. I at 47-72; ECF 16-1, R. Pt. II at 668-672.) The ALJ noted that Dr. Guttman's functional assessment – that Plaintiff "should avoid activities requiring mild or greater levels of exertion secondary to cardiac history" (ECF 16-1, R. Pt. I. at 672) – did not define mild exertion (*see* ECF 16, R. Pt. I at 32), and the ALJ found this functional assessment to be persuasive only "[t]o the extent the opinion is consistent with sedentary exertion." (*Id.*) The ALJ did not seek clarification from Dr. Guttman about what he meant by mild exertion.

36

Likewise, the ALJ found the non-examining state physicians' functional assessments persuasive insofar as they identified limitations in Plaintiff's ability to reach with her left arm; however, the ALJ also noted that Plaintiff "is limited to sedentary exertion give[n] her heart disease." (*Id.*) Even to the extent the ALJ credited these functional reports, by the time the decision was issued on September 12, 2022, the functional assessments were more than three years old and did not necessarily provide an up-to-date representation of Plaintiff's RFC. (*See* ECF 16, R. Pt. I at 56, 71; ECF 16-1, R. Pt. II at 668.)

While an ALJ's failure to request a more recent functional assessment can be harmless where "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity[,]" *Tankisi,* 521 Fed. App'x at 34, that is not the case here. In determining that Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a), the ALJ cited Dr. Kaplan's cardiology treatment records indicating an improvement in Plaintiff's cardiomyopathy and edema. (*See* ECF 16, R. Pt. I at 30.) But Dr. Kaplan's records do not address Plaintiff's COPD. While cardiomyopathy can cause shortness of breath and consequent inability to stand, walk, or speak for extended periods of time, *see Cardiomyopathy,* MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/cardiomyopathy/symptoms-causes/syc-203707095 (Feb. 21, 2024), so too can COPD. *See COPD,* Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/copd/symptoms-causes/syc-20353679 (Mar. 13, 2026). Although the Record contains treatment notes from Plaintiff's otolaryngologist, Dr. Smith, mentioning Plaintiff's COPD, these references are made in passing and do not provide insight into the functional impact of Plaintiff's COPD. (*See* ECF 16-2, R. Pt. II at 718, 729, 731, 741.) In the absence of

37

records – let alone recent records – reflecting the functional impact of Plaintiff's COPD on her breathing, there are "obvious gaps" in the Record that obligated the ALJ to develop the medical record further. *Eusepi*, 595 F. App'x at 9.

Furthermore, the ALJ's duty to develop the medical record cannot, as the Commissioner implies, be delegated to Plaintiff; accordingly, Plaintiff's alleged failure to meet her "burden to produce evidence proving that she was disabled" does not excuse the Commissioner's failure to develop the record. (ECF 23, Commissioner's Opp. at 16.); *see also Carr v. Comm'r of Social Security,* No. 16-CV-5877 (VSB) (JCF), 2017 WL 1957044, at *10 (S.D.N.Y. May 11, 2017) ("[T]he ALJ has an affirmative duty to develop the record that is independent of the plaintiffs' duty to provide evidence."); *Osorio v. Barnhart,* No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006) (emphasizing an ALJ's heightened duty to develop the record where a claimant is unrepresented). Indeed, the ALJ's duty to develop the record kicks in precisely when an applicant's evidence has gaps. Accordingly, Plaintiff's burden to produce evidence in support of her claim does not nullify an ALJ's responsibility to develop the medical record to bridge "obvious gaps." *Eusepi*, 595 F. App'x at 9.

B.    The ALJ Failed To Account for Plaintiff's Respiratory Problems

Since an ALJ's duty to develop the record is a threshold issue, remand is warranted when the ALJ fails to discharge the duty to develop the record. *See Jackson v. Kijakazi,* 588 F. Supp. 3d 558, 583 (S.D.N.Y. 2022). Nevertheless, in the event that Your Honor disagrees with my conclusion that the ALJ failed to discharge her duty to develop the Record, I turn to the question whether the ALJ overlooked Plaintiff's respiratory impairments when determining her RFC.

In challenging the RFC determination, Plaintiff argues that the ALJ improperly disregarded her "extensive history of difficulty breathing" caused by her heart condition and COPD. (*See* ECF 18, Pl.'s Mem. at 14.) Plaintiff notes that while the ALJ relies on Dr. Kaplan's treatment notes for the proposition that Plaintiff's cardiomyopathy improved, this condition is "irrelevant to her disabling shortness of breath." (*See id.* at 15.)

The Commissioner counters that, for remand to be warranted based on the ALJ's determination of a claimant's RFC, a "reasonable factfinder would be compelled to assess greater limitations on this record." (ECF 23, Commissioner's Opp. at 8-9) (citing *Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012) and *Smith v. Berryhill,* 740 F. App'x 721, 726 (2d Cir. 2018)).) In support of the ALJ's RFC determination, the Commissioner cites the ALJ's detailed summary of Plaintiff's symptoms and treatment history from 2017 through 2021 – including a treatment note from Plaintiff's visit to Dr. Kaplan on February 11, 2021, where she denied experiencing shortness of breath – and her discussion of Plaintiff's daily activities, namely a passing reference to Plaintiff's ability do laundry and "light cleaning," which she mentioned in 2019 on a functional report in connection with her application. (*See* ECF 23, Commissioner's Opp. at 3-5.) The Commissioner ultimately concludes that there is substantial evidence to support a sedentary RFC. (*See* ECF 23, Commissioner's Opp. at 9-13.)

Plaintiff responds that the ALJ failed to consider her respiratory impairment as part of the RFC determination, because "sedentary work is inconsistent with [Plaintiff's] capabilities and medical history." (ECF 24, Pl.'s Mem. at 3.) Plaintiff testified that her breathing problems prevent her from performing jobs that require two hours of standing and walking and concludes that the ALJ cherrypicked Plaintiff's impairments without considering the "combined

effect of all of the claimant's impairments," as required by law. (*Id.* at 3, 6 (citing *Burgin v. Astrue,* 348 F. App'x 646, 647 (2d Cir. 2009)).)

Plaintiff is correct that an ALJ must consider every impairment when assessing a claimant's RFC. *See* 20 C.F.R. § 416.945(a)(2); *see also Coulter v. Comm'r of Soc. Sec.,* 673 F. Supp. 3d 365, 376 (S.D.N.Y. 2023) ("When formulating the claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments including medically determinable impairments that are not severe.") While the ALJ determined that Plaintiff's COPD constitutes a severe impairment that "significantly limit[s] [her] ability to perform basic work activities" and acknowledges Plaintiff's extensive history of respiratory symptoms (ECF 16, R. Pt. I at 25, 28-30), the ALJ identified only one breathing-related limitation on Plaintiff's RFC – "no more than occasional exposure to respiratory irritants." (*Id.* at 27.) The ALJ indicated that this "environmental limitation" sufficiently addresses Plaintiff's respiratory impairments, because "there is nothing in the record to indicate that [her respiratory impairments] are not controlled." (*See id.* at 32.) In support, the ALJ points to Plaintiff's prescription for an inhaler that discharges Ventolin, an inhaled medication that treats breathing problems. (*See id.*) That Plaintiff is treated with medication for breathing issues does not necessarily support a conclusion that the medication adequately controls Plaintiff's breathing problems. Nor is there any indication that environmental irritants are the sole or even a major cause of Plaintiff's COPD, such that the environmental restriction would necessarily make it possible for Plaintiff to perform sedentary work. But this is a dubious basis upon which to broadly conclude that Plaintiff's COPD – a condition that the ALJ herself described as a severe impairment (*see id.* at 32-34, 472) – is well controlled.

The ALJ also failed to consider the combined effect of all claimant's impairments, as required by the Second Circuit. *See Burgin,* 348 F. App'x at 647. For example, despite characterizing Plaintiff's peripheral neuropathy, COPD, and congestive heart failure as severe impairments, the ALJ failed to consider their combined effects on Plaintiff's ability to stand and walk for hours at a time, as required by sedentary work. (*See* ECF 16, R. Pt. I at 25.)

Accordingly, I respectfully recommend that the ALJ's failure to adequately account for Plaintiff's respiratory impairments or to weigh the combined effects of Plaintiff's numerous impairments supports a decision to remand for further administrative proceedings.

C.    The ALJ's Basis for an Adverse Credibility Determination

Also in the event that Your Honor disagrees with my conclusion that the ALJ failed to discharge her duty to develop the Record, I turn to whether the ALJ failed to articulate a basis for her determination that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely consistent with the medical evidence." (ECF 16, R. Pt. I at 28.)

Plaintiff asserts that, to the extent that a claimant's alleged symptoms are not substantiated by objective medical records, "the ALJ must engage in a credibility inquiry" based on "substantial evidence." (ECF 18, Pl.'s Mem. at 19 (citing *Fontanarosa v. Colvin,* No. 13-CV-3285 (MKB), 2014 WL 4273321, at *12 (E.D.N.Y. Aug. 28, 2014) and *Correale-Englehart v. Astrue,* 687 F. Supp. 2d 396, 435-36 (S.D.N.Y. Feb. 8, 2010)).) The Commissioner counters that the ALJ properly followed the applicable two-step process for evaluating the intensity, persistence, and limiting effects of Plaintiff's subjective statements about her symptoms. (*See* ECF 23, Commissioner's Opp. at 15.) Specifically, the Commissioner argues that the ALJ

41

considered Plaintiff's daily activities, the factors that aggravate Plaintiff's symptoms, and the

efficacy of treatment and medications used to alleviate Plaintiff's symptoms and concludes that

the ALJ properly evaluated Plaintiff's subjective complaints. (*See id.*) In her reply brief, Plaintiff

notes that the ALJ failed to credit her testimony about her breathing difficulties and consequent

inability to walk more than one-and-a-half blocks at a time or stand for more than ten minutes.

(*See* ECF 24, Pl.'s Reply at 7.)[19]

Courts in this District routinely remand cases for additional administrative proceedings

where the ALJ fails to provide sufficient explanation for deeming a claimant's self-reported

symptoms inconsistent with the administrative record. *See, e.g., Daniels v. Kijakazi,* 617 F. Supp.

3d 180, 192-93 (S.D.N.Y. 2022) (remanding a case where the ALJ made an adverse credibility

determination but provided "a neutral summary of the various medical opinions in the record

followed by only the briefest analysis of each opinion"); *Dixon v. Berryhill,* No. 17-CV-0334 (AJP),

2017 WL 3172849, at *15 (S.D.N.Y. July 26, 2017) (noting that, where an ALJ concludes that a

claimant's statements about her symptoms are unsupported by the record, the ALJ's decision

must "contain specific reasons for the weight given to the individual's symptoms, be consistent

with and supported by the evidence, and be clearly articulated").

The ALJ acknowledged that Plaintiff's medically determinable impairments could

reasonably be expected to cause the alleged symptoms, satisfying the first step of the requisite

two-step analysis. (*See* ECF 16, R. Pt. I at 28.) In the second step, the ALJ found Plaintiff's

---

[19]     Plaintiff also contends that the Commissioner "makes no argument in response" and has therefore abandoned the defense. (ECF 24, Pl.'s Reply at 7.) The Commissioner's position on the ALJ's application of the two-step process is sufficiently responsive to Plaintiff's position, such that the Commissioner should not be found to have waived the defense.

statements about her symptoms to be "not entirely consistent with the medical evidence and other evidence in the record[.]" (*Id.*) The ALJ articulated two reasons: (1) that Dr. Kaplan's cardiology treatment notes from 2020 and 2021 suggest that Plaintiff's cardiomyopathy was largely asymptomatic with medication; and (2) that, while Plaintiff was diagnosed with neuropathy, "there is no indication . . . that it has resulted in the severe limitations as alleged by the claimant." (*Id.*)

These reasons do not provide a basis for discrediting Plaintiff's testimony about shortness of breath due to COPD. (*See* ECF 16, R. Pt. I at 28-30.) Plaintiff explicitly testified that she cannot perform basic tasks – such as getting dressed – or undertake minimal levels of exertion – such as walking half a block – without becoming short of breath. (*See* ECF 20, Supplemental R. at 760.) In light of this testimony, the ALJ's conclusion that Plaintiff has a sedentary RFC with limitations, meaning that she can stand or walk for up to two hours per day, among other activities, amounts to an implicit adverse credibility determination. The ALJ's reliance on medical records concerning cardiomyopathy and neuropathy do not adequately explain the ALJ's conclusion that Plaintiff exaggerated the severity of her breathing difficulties and associated problems. Accordingly, I respectfully recommend that remand is warranted so that the ALJ can provide the required explanation. *See Daniels,* 617 F. Supp. 3d at 193.

## **CONCLUSION**

For the foregoing reasons, I respectfully recommend that Plaintiff's motion be GRANTED and that the case be REMANDED for further proceedings. If Your Honor adopts this report and recommendation, on remand, the ALJ should be directed to obtain a fresh functional assessment, preferably from a treating provider; to reassess Plaintiff's RFC and the

corresponding availability of suitable jobs existing in sufficient numbers in the national economy, particularly in light of the record evidence about Plaintiff's shortness of breath and other respiratory symptoms; and to conduct a sufficiently reasoned analysis of Plaintiff's credibility.

Dated: May 1, 2026
     New York, New York

Respectfully Submitted,

_____

**ROBYN F. TARNOFSKY**
**United States Magistrate Judge**

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO REPORT AND RECOMMENDATION**

The parties shall have fourteen days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure to this Report and Recommendation. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Ramos.

THE FAILURE TO OBJECT WITHIN FOURTEEN DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).